# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| Merial LLC, | |
| Plaintiff, | Civ. Action No. 1:11-cv-02888-JOF |
| v. | |
| Bayer Healthcare, LLC, | **JURY TRIAL DEMANDED** |
| Defendant | |

## FIRST AMENDED COMPLAINT

NOW COMES plaintiff MERIAL LLC ("Merial"), and files this complaint requesting permanent injunctive relief, a declaratory judgment, and monetary damages against defendant BAYER HEALTHCARE, LLC ("Bayer"). In support thereof, Merial respectfully shows as follows:

### NATURE OF ACTION

1.   Merial brings this action first to address Bayer's false and/or misleading commercial advertising and promotions. Specifically, Bayer has been comparing its canine heartworm disease preventive, Advantage Multi® for Dogs ("Advantage Multi"), to competing heartworm disease preventives, including Merial's HEARTGARD® Plus for Dogs ("HEARTGARD"). The claims and

-1-

comparisons that Bayer makes in its advertisements and promotions purport to be test-proven claims of superior efficacy, when, in fact, the cited study does not support such claims.

2.     Indeed, no legitimate study has concluded that Advantage Multi is more effective than HEARTGARD when both products are properly used in accordance with their respective FDA-approved labels.

3.     Additionally, Bayer has asserted that Merial's advertising for its flagship flea and tick treatment and preventive product, FRONTLINE® Plus ("FRONTLINE PLUS") is "false and misleading" because Merial has allegedly claimed, among other things, that FRONTLINE PLUS is a "complete killing force," "kills fleas and ticks immediately following application," "is 100 percent effective against fleas and ticks," and "retains that complete effectiveness for a full 30 days."  Although, as described below, Merial believes that Bayer's accusations are baseless, to the extent they have any merit, Merial asserts that Bayer's own advertisements for its K9 Advantix® ("K9 Advantix") and Advantage® ("Advantage") products constitute false and/or misleading commercial advertising and promotions.  For example, Bayer's advertisements imply that its K9 Advantix and Advantage products are 100% effective when they are not.

-2-

4.     Merial brings this action for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370 *et seq*., and unfair competition under O.C.G.A. § 23-2-55 and the common law.  Merial seeks a permanent injunction, corrective advertising, and damages to redress Bayer's false advertising.

5.     Merial also brings this declaratory judgment action to address Bayer's ongoing baseless accusations challenging the accuracy of certain of Merial's advertising for FRONTLINE PLUS.  FRONTLINE PLUS is the leading product of its kind in the market.  Unwilling to compete in the marketplace, Bayer instead attacked certain of Merial's FRONTLINE PLUS advertisements as false or unsubstantiated.   Merial voluntarily attempted to resolve the parties' dispute through a non-binding dispute resolution procedure before the National Advertising Division of the Better Business Bureaus ("NAD") and its National Advertising Review Board ("NARB").  While Merial disagreed with some of the NAD and NARB's conclusions, it nonetheless in the spirit of good faith elected to modify its ongoing ads.  Bayer remains unsatisfied and continues to attack Merial's ads.  It has become clear that Bayer will continue its attacks unless a court of competent jurisdiction issues a ruling based on legitimate legal standards.  Merial

-3-

has not engaged in false advertising, and seeks a declaratory judgment that it has not violated the Lanham Act.

6.      Bayer's continued complaints about certain of Merial's FRONTLINE PLUS advertisements, even after Merial's voluntary and good faith participation in a review of those advertisements by the NAD and NARB, after which Merial made certain recommended changes to its print, television, and Internet advertisements for FRONTLINE PLUS, have created a cloud over this advertising for FRONTLINE PLUS.  Through this declaratory judgment action, Merial seeks to clear its good name and put an end to Bayer's baseless attacks on Merial's advertising.

7.      Merial brings this action for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Merial seeks a declaratory judgment that its print, television, and Internet advertisements for FRONTLINE PLUS at issue do not violate the Lanham Act.

<u>PARTIES</u>

8.      Merial is a company limited by shares registered in England and Wales (registered number 3332751) with a registered office at PO Box 327, Sandringham House, Sandringham Avenue, Harlow Business Park, Harlow, Essex

-4-

CM19 5QA, England.  It is domesticated in Delaware as Merial LLC, and has a place of business at 3239 Satellite Blvd., Duluth, Georgia 30096 ("Merial"). Merial is a leading supplier of veterinary pharmaceutical products, including HEARTGARD, and topically-administered pesticides, including FRONTLINE PLUS.

9.     On information and belief, Bayer Healthcare LLC is a limited liability corporation organized under the laws of Delaware with its principal place of business at 555 White Plains Road, Tarrytown, New York.  Bayer, through its Animal Health Division, the principal office of which is located in Shawnee Mission, Kansas, is a manufacturer and distributor of a variety of prescription and over-the-counter animal health care products advertised and sold throughout the United States and worldwide, including in this State and judicial district.  It competes with Merial in the sale of veterinary pharmaceutical products, specifically with Advantage Multi, and topically-administered pesticides, specifically with K9 Advantix and Advantage, and other products in this judicial district.

<u>JURISDICTION AND VENUE</u>

10.    This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121(a) (action arising under the Lanham Act) and 28 U.S.C. § 1331

(action arising under the laws of the United States), § 1338(a) (action arising under the Lanham Act), § 1338(b) (action asserting claim of unfair competition joined with substantial and related claim under the Lanham Act), § 1367 (supplemental jurisdiction), and §§ 2201 and 2202 (action arising under the Declaratory Judgment Act).

11.     This Court has personal jurisdiction over Bayer, and venue is proper within this judicial district pursuant to 28 U.S.C. § 1391.  Bayer sells Advantage Multi, K9 Advantix, Advantage, and other products in this judicial district.  Bayer has placed many of the false and misleading advertisements that are the subject of this action into interstate commerce and sent them into this judicial district.

FACTS

## I.     HEARTWORM DISEASE

12.     Canine heartworm disease was first described over 150 years ago. Heartworm infections have been reported throughout the United States and Canada.  The disease is caused by parasitic worms that reside in a dog's heart and arteries of its lungs.  Infected animals may be lethargic and cough persistently.  If left untreated, heartworm disease may be fatal.

13.     Dogs become infected when bitten by mosquitoes carrying heartworm larvae.  The larvae migrate from the site of the mosquito bite under the dog's skin,

-6-

developing into more mature stages along the way. After several weeks, the larvae mature into juvenile worms that enter the blood vessels and are carried to the heart and lungs, where they continue to develop and grow to as long as about one foot. Once fully mature, male and female worms mate, and the females release their offspring (microfilariae) into the blood stream. Mosquitoes become infected with microfilariae when they bite a dog (or other infected host) with heartworm microfilariae in its blood.  Indeed, heartworm microfilariae will not mature in the original host animal in which they were produced; instead, they can only mature from the microfilarial stage to an infective larval stage within the mosquito.  When the mosquito picks up heartworm microfilariae from an infected dog's blood, it incubates the microfilariae into infective larvae, bites another dog, and starts a new cycle of heartworm transmission and development.

14.    Heartworm disease, consisting of mature heartworms in the heart and arteries of the lungs, is treatable, but the course of therapy can be long and expensive.   Prevention of heartworm disease is accomplished by killing the migrating tissue larvae before they can develop into mature worms.  The standard of care is to prevent the development of tissue larvae from developing into adult worms by treating animals monthly with a heartworm preventive during and after the time when there is a risk of a dog being bitten by a heartworm-infected

mosquito and, more preferably, all year round.  Current heartworm preventives include Merial's HEARTGARD and Bayer's Advantage Multi, among others.

## II.    THE PARTIES' HEARTWORM PREVENTIVES

15.    The parties' heartworm preventive products each contain drugs that are regulated by the Federal Food and Drug Administration ("FDA") under the Federal Food, Drug, and Cosmetic Act.  The FDA has approved monthly use of HEARTGARD "to prevent canine heartworm diseases by eliminating the tissue larval stage of *Dirofilaria immitis* for a month (30 days) after infection."  The FDA has approved monthly use of Advantage Multi "for the prevention of heartworm disease caused by *Dirofilaria immitis*."

### A.    Merial's HEARTGARD Product

16.    Merial's first HEARTGARD product was introduced in 1987.  In 1993, Merial introduced HEARTGARD Plus, a beef chew formulation containing ivermectin (a macrocyclic lactone) to prevent heartworm disease, and pyrantel pamoate to treat certain intestinal parasitic infections.  HEARTGARD is prescribed by veterinarians to prevent heartworm disease by eliminating the tissue larval stage of heartworms for a month (30 days) after infection.  When properly administered, HEARTGARD is highly effective in protecting dogs against developing heartworm disease.

-8-

McKool 447618v1

17.     The FDA-approved label for HEARTGARD states: "[F]or optimal performance, the chewable must be given once a month on or about the same day of the month." *See* Ex. A, left column.

B.     Bayer's Advantage Multi Product

18.     Upon information and belief, Advantage Multi is a topical solution containing moxidectin and imidacloprid. Like ivermectin, the active ingredient in HEARTGARD, moxidectin is a macrocyclic lactone. Upon information and belief, Advantage Multi protects dogs against developing heartworm disease when administered properly.

19.     The FDA-approved label for Advantage Multi states that Advantage Multi is for once-a-month use. *See* Ex. B, left column.

20.     Bayer is one of Merial's major competitors in the market for heartworm preventive products. Upon information and belief, Bayer introduced its Advantage Multi product in 2007 and sells it to veterinarians across the country for use in dogs by or on the order of a veterinarian.

21.     Upon information and belief, Advantage Multi has been slow to gain a foothold in the market for heartworm preventives.

III.   **THE BLAGBURN REPORT**

22.    Bayer commissioned Byron Blagburn, a researcher who regularly consults for Bayer, to conduct a study (the "Blagburn Study") that purportedly compared the efficacy of Advantage Multi to that of HEARTGARD and two other common heartworm preventives.  (Ex. C, p.194, Acknowledgments, ¶ 1).   The study appears in an article entitled "Comparative efficacy of four commercially available heartworm preventive products against the MP3 laboratory strain of Dirofilaria immitis" and was published in *Veterinary Parasitology* 176 (2011) 189–194 in January, 2011 (the "Blagburn Report").   A copy of the Blagburn Report is attached as Exhibit C.

23.    According to the Blagburn Report, in the Blagburn Study, forty beagles between the ages of 6 and 7 months were divided into 5 groups of 8 dogs each (1 control group and 4 treatment groups) and infected with one-hundred heartworm larvae of an atypical laboratory strain called MP3 (Ex. C, p.189, Abstract, ¶ 2).   The clinical importance and prevalence of the MP3 strain of heartworm is unknown.

24.    According to the Blagburn Report, thirty days after infection with one-hundred MP3 heartworm larvae, animals in each of the four treatment groups received a single dose of Advantage Multi (Bayer), Revolution (Pfizer), Interceptor

-10-

Flavor Tabs (Novartis), or HEARTGARD (Merial), and the control group received what the Blagburn Report described as a "mock treatment" (*i.e.*, a placebo) (Ex. C, p.190, Materials and methods, ¶¶ 2-3). Approximately four months after treatment, all dogs were euthanized and examined for the presence of adult worms and worm fragments (Ex. C, pp.190-191, Materials and methods, ¶ 5.).

25. The Blagburn Report concluded that "Percent efficacy of the products based on reduction in geometric mean worm burdens compared to controls were, ivermectin/pyrantel pamoate [*i.e.*, HEARTGARD] − 95.6% … and … imidacloprid/ moxidectin [*i.e.*, Advantage Multi] - 100%" (Ex. C, p.192, Discussion, ¶ 1.). In contrast, Bayer's advertising states or implies that whereas Advantage Multi was shown to be 100% effective, HEARTGARD was only 12% effective. *See, e.g.* Ex. E, p.3; Ex. H, p.7.

26. The FDA-approved labels for each of the tested products, including HEARTGARD and Advantage Multi, call for monthly, rather than single, one-time dosing. Yet, the Blagburn Report states that only a single dose was given. Thus, the Blagburn Report does not support a conclusion about comparative performance of Advantage Multi and HEARTGARD when used in accordance with their respective labels, which is how these products are supposed to be used in practice.

27.    Additionally, the Blagburn Report does not support Bayer's broad advertising claims because it used a single, laboratory-maintained heartworm strain of unknown clinical relevance.  Specifically, Dr. Blagburn infected dogs with the laboratory-maintained MP3 heartworm strain even though there is no evidence that MP3 is representative of any other commonly found strains.  Indeed, as explained in the Blagburn Report:

> At present, we do not know if MP3 is exemplary of similar isolates in the field or the prevalence of such isolates. Additional research is needed to determine the frequency of MP3 or genetically similar isolates in the heartworm population, if they occur naturally or are selected following the use of heartworm preventives.

(Ex. C, pp.193-194, Discussion, ¶ 8.).

28.    The Blagburn Study did not test, and the Blagburn Report makes no conclusions regarding, resistance of heartworms to current treatment preventives like HEARTGARD.

## IV.    BAYER'S PROMOTION OF THE BLAGBURN REPORT

29.    Bayer has undertaken an advertising campaign to promote Advantage Multi on the basis of the Blagburn Report.  Its campaign includes, without limitation, the following commercial advertisements and promotions:  (1) a Press Release from January, 2011, a copy of which is attached as Exhibit D (the "Bayer Press Release"); (2) a four-page brochure that Bayer began distributing at the

-12-

January 2011 North American Veterinary Conference, a copy of which is attached as Exhibit E (the "NAVC Brochure"); (3) a broadcast facsimile advertisement sent to veterinarians during January 2011, a copy of which is attached as Exhibit F (the "Dear Vet Fax"); (4) a print advertisement featured in at least the February 1, 2011 edition of the *Journal of the American Veterinary Medical Association*, a copy of which is attached as Exhibit G (the "Beaker Ad"); (5) a three-dimensional marketing mailer, a two-dimensional copy of which is attached as Exhibit H (the "Box Mailer"); and (6) a television commercial featuring seemingly sick and lethargic dogs who appear to improve upon mention of a "new study" (presumably referring to the Blagburn Report), which can be viewed at www.preventheartworm.org (the "Lethargic Dog Commercial") (collectively, Bayer's "Challenged Advertisements"). Bayer's Challenged Advertisements, however, do not merely summarize the Blagburn Report; rather they include some express or implied claims as described below that are not supported by the Blagburn Report and are therefore false and/or misleading.

A.    Bayer's Press Release

30.    The Bayer Press Release purports to announce the publication of the Blagburn Report and to summarize its contents. The Bayer Press Release was

-13-

carried at least by PR Newswire and published on numerous websites and media outlets.

31.     The Bayer Press Release begins with the following statement: "In a new comparative study evaluating the efficacy of four leading heartworm preventives, only Bayer's Advantage Multi® for Dogs (imidacloprid + moxidectin) Topical Solution was 100 percent effective after a single treatment against the MP3 strain of Dirofilaria Immitis."   *See* Ex. D at ¶ 1 (emphasis added).

32.     This and materially similar statements in the Challenged Advertisements express or imply that Advantage Multi is generally superior in heartworm disease prevention to the other tested products, including HEARTGARD (the "Superiority Claims").   However, the Blagburn Report does not support such broad claims of superior efficacy.   The Superiority Claims are false and/or misleading.

33.     In addition, the Press Release states:

> "Heartworm is a deadly disease that has been increasing in incidence in the United States, despite all efforts to prevent it. Veterinarians need a product that they can trust at all times," said Dr. Cristiano von Simson, Veterinary Technical Services Director, Bayer Animal Health.   "This study demonstrated that when dogs were infected with this challenging heartworm strain, only Advantage Multi for Dogs protected 100 percent after a single treatment."

(Ex. D, p.1).  These and similar statements state or imply that the MP3 heartworm strain is resistant to standard heartworm preventives like HEARTGARD (the "Heartworm Resistance Claim").  The Heartworm Resistance Claim is false and/or misleading because companion animals have no known exposure to the MP3 strain.  Indeed, the Blagburn Report itself states that there is no evidence that the MP3 strain exists outside of the laboratory environment nor is there any evidence that it is related to any strain that does exist in the general heartworm population (Ex. C, p.5, Discussion, ¶ 4).  These and materially similar statements in the Challenged Advertising are false and/or misleading.

B.     Bayer's 4-Page NAVC Brochure

34.    At least as early as January 2011, Bayer began distributing the NAVC Brochure at the North American Veterinary Conference.

35.    On information and belief, Bayer also has distributed the NAVC Brochure directly to veterinarians through direct mail and/or in-person meetings at veterinarians' offices.

36.    When viewed as a whole, the NAVC Brochure implicitly makes the Superiority Claim.

37.    The third page of the NAVC Brochure states: "ONLY ADVANTAGE MULTI® FOR DOGS DEMONSTRATED 100% EFFICACY."  Ex. E, p.3 (all

-15-

caps emphasis in original). This statement is accompanied by a bar graph purportedly showing 100% efficacy for Advantage Multi and 12% efficacy for the other products tested, including HEARTGARD.

38. This statement and materially similar statements in Bayer's Challenged Advertisements express or imply that the Blagburn Report concluded that HEARTGARD is only 12% effective (the "12% Efficacy Claim"). The Blagburn Report, however, actually concluded that "Percent efficacy of [HEARTGARD] based on reduction in geometric mean worm burdens compared to controls [was] 95.6%." The 12% Efficacy Claims are false and/or misleading.

39. In addition, the first page of the NAVC Brochure includes the statement, "After a single dose of Advantage Multi® for Dogs, 100% of dogs were protected from developing heartworm infection." Ex. E at 1.

40. Similarly, the back of the NAVC Brochure states, "CONCLUSION. Advantage Multi® for Dogs was the only product tested that provided 100% heartworm protection against the MP3 strain after a single treatment." Ex. E at 4.

41. These statements and materially similar statements found in Bayer's Challenged Advertisements state or imply that a single treatment is clinically appropriate dosing (the "Single Dosing Claim") in practice, even though single-dose administration of Advantage Multi or the other products is neither FDA-

-16-

approved nor clinically appropriate.  Rather, all of the tested products, including
Advantage Multi, are labeled for ongoing monthly dosing.  The Single Dosing
Claim is false and/or misleading.

C.     The Dear Vet Fax

42.    Bayer distributed the Dear Vet Fax, which contains text and graphics
similar to the NAVC Brochure—including the efficacy bar graph—to veterinarians
on or about January 19, 2011.  The Dear Vet Fax expresses or implies the
Superiority Claim, the 12% Efficacy Claim, and the Single Dosing Claim.  Each of
these express or implied claims is false and/or misleading.

D.     Bayer's Beaker Ad

43.    The Beaker Ad is entitled "New thought-provoking heartworm data
using a challenging strain" (presumably referring to the Blagburn Report) and
features a picture of four laboratory beakers, one of which (presumably
representing Advantage Multi) contains no heartworms, and the remaining three of
which (presumably representing HEARTGARD and the other tested products)
appear to contain a number of heartworms. The Beaker Ad, however, does not
mention any caveats, limitations, or qualifications on the "thought-provoking
data," *i.e.*, the Blagburn Report.  *See* Ex. G.

-17-

44.    When viewed as a whole, the Beaker Ad implicitly makes the Superiority Claim.  This Superiority Claim is false and/or misleading.

E.    The "Box" Mailer

45.    On information and belief, on or about February 17, 2011, Bayer began distributing the Box Mailer by direct mail and through in-person veterinary clinic visits.

46.    The Box Mailer is a three-dimensional Box that includes insert cards that purport to summarize the Blagburn Report.

47.    The Box Mailer expresses or implies the Superiority Claim, the 12% Efficacy Claim, and the Single Dosing Claim.  Each of these express or implied claims is false and/or misleading.

F.    Bayer's Lethargic Dog Television Commercial

48.    In or around early February 2011, Bayer ran a television commercial directed to consumers that is styled to resemble a public service announcement (Bayer's "Lethargic Dog Commercial"), which refers to "an important new clinical study" to support its claims.  On information and belief, the study referred to is the Blagburn Report.

49.    Bayer's Lethargic Dog Commercial, when viewed as a whole, implies that standard heartworm preventives, like HEARTGARD, are failing in actual

-18-

practice and encourages pet-owners to switch heartworm preventives to a purportedly more effective product—*i.e.*, Advantage Multi. By doing so, the Lethargic Dog Commercial implicitly and misleadingly makes the Superiority Claim. This Superiority Claim is false and/or misleading.

G.   Sales Representatives' Statements

50.   In addition, on information and belief, Bayer has directed its sales force to promote the Blagburn Report aggressively with veterinarians and their staffs. On information and belief, Bayer's personnel have made false and/or misleading statements to veterinarians and their staffs, including without limitation making false and/or misleading claims that: (1) Advantage Multi is superior to HEARTGARD and other heartworm preventives; (2) Advantage Multi is the only product that is effective against heartworms; (3) Advantage Multi is the best heartworm product; (4) Heartworm resistance to current heartworm preventives is a real and increasing problem in clinical practice; and (5) the FDA is considering a recall of HEARTGARD based on the Blagburn Report. On information and belief, such statements continue to be made by Bayer's sales force at Bayer's direction. These statements are false and/or misleading.

51.   On information and belief, Bayer intends to continue to make these and similar false and misleading claims about Advantage Multi and

HEARTGARD, including in advertising directed to the general public in addition to veterinarians.

H.    Deception

52.    Bayer's challenged advertisements and statements by its personnel, in addition to being false and/or and misleading, deceive or have a tendency to deceive consumers—both veterinarians who prescribe heartworm preventives as well as pet-owners who purchase such drugs for their pets.

I.    Materiality

53.    Bayer's challenged advertisements and statements by its personnel have had or are likely to have an effect on purchasing and prescribing decisions by veterinarians and/or pet owners.

J.    Harm

54.    The harm to Merial from Bayer's false and/or misleading claims of proven superiority is potentially enormous and irreparable.  Such statements— along with other similarly false and/or misleading claims—have been made in a wide variety of media and settings including trade journal publications, television, direct mail advertising to veterinarians and, on information and belief, by Bayer personnel in meetings with and sales calls to veterinarians and their staffs, at veterinary schools, and at veterinary conferences.

-20-

K.   Summary of Bayer's Promotion of the Blagburn Report

55.   In summary, Bayer's Challenged Advertisements make express or implied claims that are not supported by the Blagburn Report and are therefore false and/or misleading, including: (1) the Superiority Claims; (2) the Heartworm Resistance Claim; (3) the 12% Efficacy Claim; and (4) the Single Dosing Claim.

V.   **THE PARTIES' TOPICAL PESTICIDES**

56.   The parties' topical pesticide products, Merial's FRONTLINE PLUS, and Bayer's K9 Advantix and Advantage, are available through veterinarians nationwide.   K9 Advantix and Advantage are also sold at pet supply stores nationwide.   These products are regulated by the Environmental Protection Agency ("EPA").

A.   Merial's FRONTLINE PLUS Product

57.   Merial introduced its line of FRONTLINE products in 1996.   Since then, the FRONTLINE products have become Merial's flagship brand and been enormously successful.   They have grown from an initial spray to spot-on applications, including FRONTLINE PLUS.

58.   FRONTLINE PLUS is a topically-administered pesticide available for use on both dogs and cats.   Its active ingredients include fipronil and (S)-methoprene, which enable FRONTLINE PLUS to kill ticks and fleas at multiple

-21-

stages of their life cycles (*e.g.*, adults, eggs, and larvae).  By killing the pests and breaking their life cycles, re-infestation of a dog or cat is prevented.

59.    FRONTLINE PLUS comes in a disposable applicator and is administered to a dog's or cat's skin between the shoulder blades.   There, FRONTLINE PLUS collects in the oils of the dog's or cat's skin and hair follicles and begins to work on pests on contact.  It is also continually released over time from the hair follicles onto the skin and coat of the treated animal, and such continual release results in long-lasting activity against fleas and ticks for both dogs and cats.

60.    Accordingly, FRONTLINE PLUS is the only product on the market that does all of the following: (1) kills fleas at multiple stages of the life cycle, thereby interrupting and eliminating flea infestations; (2) kills ticks at multiple stages of the life cycle; and (3) works on both dogs and cats.  This combination of characteristics makes FRONTLINE PLUS unique among its competition.

B.    Bayer's K9 Advantix and Advantage Products

61.    Bayer makes and sells K9 Advantix and Advantage, which compete with Merial's FRONTLINE PLUS.   K9 Advantix and Advantage are spot-on treatments aimed at killing pests.

62.    Specifically, K9 Advantix treats fleas, ticks, lice, mosquitoes and biting flies on dogs.  It contains imidacloprid and permethrin that affect pests on contact.  Permethrin is toxic to cats.  Accordingly, K9 Advantix cannot be used on cats.

63.    Advantage treats fleas and lice, but not ticks, and can be used on both cats and dogs.  It contains imidacloprid which also affects pests on contact.

## VI.    MERIAL'S ADVERTISEMENTS FOR FRONTLINE PLUS

64.    Merial's advertising campaign for FRONTLINE PLUS includes print, television, and Internet advertisements.   All of the advertisements promote the efficacy of FRONTLINE PLUS against multiple life stages of fleas and ticks. They are based on approved product labels and published, reliable, scientific studies.

### A.    Bayer's Prior Challenge

65.    On or about June 15, 2010, Bayer initiated a challenge with the NAD against certain of Merial's print, television, and Internet advertisements for FRONTLINE PLUS.   The NAD is an organization that provides a dispute resolution forum as a means for advertisers to engage voluntarily in "self-regulation."   The NAD is not bound by any legal or evidentiary standards in

-23-

evaluating advertising complaints.   In this forum, Bayer alleged that Merial's advertisements were false, misleading, and unsubstantiated.

66.    Merial responded and disputed Bayer's allegations with the NAD. Merial provided evidence that Bayer's contentions were unreasonable and unsupportable, and also provided substantiation for Merial's advertising claims.

67.    The NAD heard from both parties and issued a final report in December 2010 recognizing FRONTLINE PLUS' unique combination of pest-fighting capabilities.   The NAD also confirmed that Merial had adequate support for certain claims in its advertisements and that other aspects of the advertisements were fanciful and non-literal and therefore appropriate.

68.    The NAD recommended Merial discontinue or modify other portions of its FRONTLINE PLUS advertising campaign.   Even though the NAD does not apply the Lanham Act or other legal standards to its analysis, Merial stated in response that it would take the NAD's recommendations into consideration for future FRONTLINE PLUS advertising, with one exception relating to Merial's television commercial for FRONTLINE PLUS, which Merial appealed to the NARB.

McKool 447618v1

69.     The NARB heard from both parties and issued a final decision in May 2011 affirming the NAD's decision in which it recommended Merial discontinue or modify the television commercial.

70.     Hence, in accordance with both the NAD and the NARB's recommendations, Merial modified its television commercial for FRONTLINE PLUS.

B.     Merial's FRONTLINE PLUS Advertising

71.     Merial's advertising campaign for FRONTLINE PLUS at issue includes print, television, and Internet advertisements.  Each advertisement in the campaign, when viewed as a whole, in context of the entire advertisement, promotes FRONTLINE PLUS' pest-fighting capabilities in an accurate and appropriate manner.

72.     Merial's at-issue print advertisement for FRONTLINE PLUS (the "FRONTLINE PLUS Print Advertisement") states in the middle of the page: "Unleash the complete killing force against fleas and ticks."  At the bottom of the page, the advertisement states: "What makes FRONTLINE® Plus complete?  It annihilates the flea life cycle by killing fleas as adults, eggs, and larvae.  Ticks, too."  A copy of the FRONTLINE PLUS Print Advertisement is attached as Exhibit I.

-25-

73.    When viewed as a whole, the FRONTLINE PLUS Print Advertisement explains exactly how FRONTLINE PLUS is a "complete killing force"—by interrupting and eliminating the flea life cycle in fleas, by killing ticks, and by doing so on both dogs and cats.   And, this is how FRONTLINE PLUS works.   Thus, the FRONTLINE PLUS Print Advertisement is not false or misleading.

74.    Merial also has at-issue a television commercial (the "FRONTLINE PLUS Television Commercial") promoting the attributes of FRONTLINE PLUS. In addition to having been aired on television, the FRONTLINE PLUS Television Commercial was previously available for viewing at www.completekiller.com/frontlineplus/meet-the-force.   The FRONTLINE PLUS Television Commercial shows a pet owner applying FRONTLINE PLUS to her dog, and then switches to a cartoon format depiction of liquid green "ninja-style" fighters falling from the FRONTLINE PLUS pipette onto the pet and fighting with—and vanquishing—fleas and ticks.   The phrases "Starts killing within 4 hrs" and "Kills 100% of fleas within 12 hrs" appear beneath the ninjas during the animated pest-killing sequence.    These statements are accurate and substantiated, and explain the timing within which pet-owners can expect FRONTLINE PLUS to become effective.

-26-

75.    The visual image of little green cartoon "ninjas" killing fleas and ticks in the pet's fur is a fanciful and animated representation of FRONTLINE PLUS' mode of action.  When FRONTLINE PLUS collects in the oils of the animal's skin and hair follicles, it continues to be released onto the animal's skin and coat.  The flea or tick need only come into contact with FRONTLINE PLUS, at which point it begins its work.  The fanciful ninjas' attack on the fleas and ticks is a playful, entertaining representation of the active ingredients' contact with the pests.

76.    During this imaginary cartoon depiction, the voiceover states: "Using Frontline Plus shows your pet you care by unleashing a complete killing force against fleas and ticks.  And not just adult fleas.  What makes FRONTLINE PLUS complete is that it breaks the flea life cycle killing adults, eggs, and larvae.  And it keeps killing fleas and ticks all month long.  That's why it's the number one choice of vets for their pets and yours.  Unleash a complete killing force in every dose of FRONTLINE PLUS."

77.    The FRONTLINE PLUS Television Commercial communicates both visually and verbally that FRONTLINE PLUS is "complete" in the sense that, unlike other products available in the marketplace, one dose of FRONTLINE PLUS is effective against multiple life stages of fleas and ticks.  As this is, in fact, how FRONTLINE PLUS works, the advertisement is not false or misleading.

-27-

78.    Finally, Merial previously advertised for FRONTLINE PLUS on the Internet at www.completekiller.com.  A selection of pages from this Internet site is Exhibit J.   The home page of this site contained the phrase "unleash the complete killing force against fleas and ticks."  Featured prominently beneath the phrase was the descriptor and qualifying statement: "What makes FRONTLINE Plus complete?  It works on dogs and cats to kill adult fleas, their eggs, larvae, and ticks."  This is an express definition of what is meant by "complete."

79.    Another page of the website provided pet owners with application instructions and clearly sets forth the capabilities of FRONTLINE PLUS.  *See* Ex. J at 4.   It provided: "FRONTLINE PLUS is the Vet's #1 Choice flea and tick killer, annihilating fleas as adults, eggs, and larvae.  Here are some other things that make FRONTLINE PLUS the flea and tick treatment vets trust most:  Kills up to 100% of fleas on your pet within 12 hours; Keeps killing fleas and ticks all month long; Works on dogs and cats; Waterproof."

80.    These Internet advertisements thus explained how FRONTLINE PLUS kills fleas as adults, eggs, and larvae, and ticks, and describe different characteristics about FRONTLINE PLUS for consumers.  They are all accurate representations of the capabilities of FRONTLINE PLUS.

C.    Bayer's Prior Compliance Inquiry to the NAD

81.     On or about June 9, 2011, Bayer initiated a compliance inquiry relating to the NAD's December 2010 report in which Bayer complained that Merial's FRONTLINE PLUS advertising failed to comply with the NAD's and NARB's recommendations.

82.     Again, Merial responded and disputed Bayer's allegations.   Merial explained the actions it took to modify its FRONTLINE PLUS advertising campaign in response to the NAD's and NARB's recommendations.   Merial also described its approach to compliance and exposed the flaws in Bayer's inquiry.

83.     The NAD accepted statements from both parties and issued a report in June 2011, taking the position that Merial had not modified its advertising as recommended by the NAD and NARB.

84.     Merial disagrees with the NAD's June 2011 report.    Merial's FRONTLINE PLUS advertising is accurate and not false or misleading, and further Merial believes it has accurately and adequately addressed the NAD's and NARB's recommendations.

D.     The Parties' Current Controversy

85.     All of this comes at the behest of Bayer.  Rather than competing in the marketplace on the merits of its products, Bayer continues to attack the truthful and accurate express claims made about FRONTLINE PLUS in Merial's print,

-29-

television, and Internet advertisements.  Bayer's ongoing accusations cast a cloud over Merial's flagship brand and need to be dealt with by a court of law.

86.   The foregoing facts demonstrate that Bayer has repeatedly accused Merial of promulgating false, misleading, and unsubstantiated advertisements for FRONTLINE PLUS.  As evidenced by Bayer's Counterclaims, Merial has a real, present, and justifiable fear that it will be sued by Bayer for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), based on Merial's print, television, and Internet advertisements for FRONTLINE PLUS.

87.   Bayer disputes Merial's legal right to run one or more of the aforementioned FRONTLINE PLUS advertisements.  The facts alleged herein show that a substantial controversy exists between Merial and Bayer, parties having adverse legal interests, regarding the accuracy of Merial's print, television, and Internet advertisements for FRONTLINE PLUS, and that this controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

88.   The Court may and should exercise its discretion to adjudicate this action under the Declaratory Judgment Act.  There is no better or more effective remedy or forum for resolving the present controversy.  Such adjudication will serve the underlying purposes of the Declaratory Judgment Act by resolving disputes between Merial and Bayer regarding their respective legal rights

-30-

concerning the advertisements for FRONTLINE PLUS.  These disputes should be resolved efficiently and economically in this action, deciding the controversies between the parties with certainty, completeness, and finality.

## VII. BAYER ACCUSES MERIAL OF FALSE ADVERTISING AND UNFAIR COMPETITION WITH RESPECT TO MERIAL'S FRONTLINE PLUS PRODUCT

89.   As described above and as made explicit in its Counterclaims, Bayer accuses Merial of false advertising and unfair competition in connection with Merial's advertisements relating to FRONTLINE PLUS.   For example, Bayer asserts that Merial has made "multiple false and misleading claims centered around the description of its product as the 'complete killing force.'   Those false and misleading claims include that Frontline Plus kills fleas and ticks immediately following application, that it is 100 percent effective against fleas and ticks, and that it retains that complete effectiveness for a full 30 days."  *See* Counterclaims at 2 (emphasis added).

90.   Bayer asserts that Merial's FRONTLINE PLUS advertisements constitute false advertising under Section 43(a) of the Lanham Act, violate the Georgia Deceptive Trade Practices Act, and constitute false advertising and unfair competition under state law.  *Id.* at 17-20.

-31-

## VIII. BAYER MAKES EFFICACY CLAIMS SIMILAR TO MERIAL'S WITH RESPECT TO BAYER'S K9 ADVANTIX AND ADVANTAGE PRODUCTS

91.    Although Merial vigorously disputes that its FRONTLINE PLUS advertisements violate any law, to the extent that they do, Merial asserts that Bayer's K9 Advantix and Advantage advertisements violate Section 43(a) of the Lanham Act, violate the Georgia Deceptive Trade Practices Act, and constitute false advertising and unfair competition under state law to the extent that Bayer's advertisements imply that its K9 Advantix and Advantage products are 100% effective, when they are not.

92.    For example:

> A.    Since approximately April 4, 2011, Bayer has been running its "K9 Advantix® II Pooch Protest" advertisement.  *See* http://www.petparents.com/show.aspx/k9-advantix-pooch-protest;   http://www.youtube.com/watch?v=Ny0b0Qzk4WQ. The advertisement states that K9 Advantix "not only kills fleas and ticks, it repels most ticks before they can attach and snack on us."  As shown in the clips below, during the voiceover, the advertisement depicts a stick-figure drawing of an Advantix II-treated dog with four fleas/ticks on it that all simultaneously die or fall off the dog when Advantix II is discussed.  In contrast, the advertisement also shows four fleas/ticks on a stick-figure dog treated with FRONTLINE PLUS, and none of the fleas/ticks are shown to die.





To the extent Merial's challenged advertising is determined to imply falsely that its product is 100% effective, so too does this advertisement falsely imply that K9 Advantix II is 100% effective.  In addition, this advertisement falsely implies that FRONTLINE PLUS is 0% effective against fleas/ticks.

B.  On information and belief, at least as recently as March 29, 2010, Bayer has run a television commercial titled "Frisbee Turns Into a Saw That Kills Fleas" for its Advantage product. The commercial states, "Advantage topical solution treats dogs. But <u>destroys</u> fleas."  (Emphasis added).  To the extent Merial's challenged advertising is determined to imply falsely that its

-33-

product is 100% effective, so too does this advertisement falsely imply that Advantage is 100% effective.

C.   Bayer currently operates the website www.nofleas.com, which redirects internet traffic to www.petparents.com, where Bayer advertises its Advantage product.   The website displays the slogan, "Don't give fleas a biting chance.  Flea bites are painful and can be highly stressful for a pet.  Also, fleas lay many eggs, leading to infestation in the home.  That's why it's important to protect your dog or cat from fleas with a monthly topical flea preventive."  To the extent Merial's challenged advertising is determined to imply falsely that its product is 100% effective, so too does the domain name www.nofleas.com and the content therein falsely imply that Bayer's products advertised on the website (Advantage products) are 100% effective against fleas.

93.   If Merial's FRONTLINE PLUS advertisements violate Section 43(a) of the Lanham Act, violate the Georgia Deceptive Trade Practices Act, and constitute false advertising and unfair competition under state law by implying 100% efficacy of FRONTLINE PLUS, then so too would Bayer's advertisements that imply 100% efficacy of its flea and tick preventive products (i.e., Advantage, Advantix, and Advantix II), including but not limited to the foregoing advertisements.

## COUNT I

## FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT

94.   Merial repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

-34-

95.     Bayer's false, deceptive, and/or misleading advertising and promotion in interstate commerce violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

96.     Bayer's false, deceptive, and/or misleading advertising has the capacity to deceive customers and is likely to influence purchasing decisions.

97.     Bayer's false, deceptive, and/or misleading advertisements have a material effect on purchasing decisions.

98.     Bayer's false, deceptive, and/or misleading advertising has caused and will continue to cause irreparable harm to Merial unless and until Bayer's conduct is enjoined by the Court, and Merial has no adequate remedy at law.

99.     As a direct and proximate result of Bayer's false, deceptive, and/or misleading advertising, Merial has suffered damages in an amount to be determined by the trier of fact.

<u>COUNT II</u>

<u>VIOLATION OF THE GEORGIA DECEPTIVE TRADE PRACTICE ACT</u>

100.    Merial repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

101.    Bayer's false, deceptive, and misleading advertising and promotional activities violate the Georgia Deceptive Trade Practices Act, O.C.G.A. § 10-1-372.

-35-

## COUNT III

## VIOLATION OF THE GEORGIA UNFAIR COMPETITION STATUTE

102.   Merial repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

103.   Bayer's false, deceptive, and misleading advertising and promotional activities violate the Georgia Unfair Competition Statute, O.C.G.A. § 23-2-55.

## COUNT IV

## COMMON LAW UNFAIR COMPETITION

104.   Merial repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

105.   By reason of the foregoing, Bayer has engaged in unfair competition in violation of the common law.

## COUNT V

## DECLARATORY JUDGMENT

106.   Merial repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

107.   An actual and justiciable controversy exists between Merial and Bayer regarding Bayer's allegations that certain of Merial's advertisements for FRONTLINE PLUS are false, misleading, and/or unsubstantiated.

-36-

108.   Merial's print, television, and Internet advertisements described herein, and previously at issue before the NAD and NARB, are not false, misleading, or unsubstantiated; rather, they are truthful and accurate.  The claims made in these advertisements for FRONTLINE PLUS are clear and properly substantiated by approved product labels and published, reliable, scientific studies.

109.   Merial is entitled to a judgment declaring that its print, television, and Internet advertisements for FRONTLINE PLUS are not false, misleading, or unsubstantiated and that they do not violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

JURY DEMAND

Merial demands a trial by jury on all issues so triable as a matter of right and law.

PRAYER FOR RELIEF

WHEREFORE, by virtue of the unlawful conduct of Bayer and the lawful conduct of Merial as alleged in this Complaint, plaintiff Merial respectfully prays that:

A.   The Court enter judgment that Bayer has engaged in false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), has engaged in deceptive trade practices in violation of the Georgia Uniform Deceptive Trade

-37-

Practices Act, O.C.G.A. § 10-1-370 et seq., and has engaged in unfair competition under O.C.G.A. § 23-2-55 and the common law;

B.     The Court permanently enjoin Bayer, its officers, agents and servants, employees, attorneys, and all others in active concert of participation with it who receive actual notice, pursuant to Fed. R. Civ. P. 65 and 15 U.S.C. § 1116(a), from:

(1)     publishing the advertising and promotional material attached as Exhibits B, C, D, E, and F to the Complaint or materials substantially similar thereto;

(2)     stating or implying in commercial advertising or promotion, including through its sales personnel, that Advantage Multi has superior efficacy over, or has proven superiority over, HEARTGARD without having scientifically valid support for such claims;

(3)     publishing in commercial advertising or promotion the deceptive bar graph depicted in Exhibit H;

(4)     stating or implying in commercial advertising or promotion, including through its sales personnel, that HEARTGARD is ineffective when administered in accordance with its label instructions;

(5)     stating or implying in commercial advertising or promotion, including through its sales personnel, that animals that receive HEARTGARD in

-38-

accordance with its label instructions are at risk of contracting heartworm disease; and

      (6)    stating or implying in commercial advertising or promotion, including through its sales personnel, that heartworm strains—including the MP3 strain—are developing or have developed resistance to HEARTGARD on the basis of the Blagburn Study;

    C.    The Court declare that Merial's print, television, and Internet advertisements for FRONTLINE PLUS at issue in this case including those attached as Exhibits I and J are not false, misleading, or unsubstantiated and do not violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

    D.    To the extent the Merial advertisements for FRONTLINE PLUS are determined to imply falsely 100% efficacy and Merial's prayer for declaratory judgment denied, that the Court permanently enjoin Bayer, its officers, agents and servants, employees, attorneys, and all others in active concert of participation with it who receive actual notice, pursuant to Fed. R. Civ. P. 65 and 15 U.S.C. § 1116(a), from:

      (1)    publishing the advertising and promotional material referenced in Paragraphs 91-93 above, or materials substantially similar thereto; and

(2)     stating or implying in commercial advertising or promotion, including through its sales personnel, that Bayer's K9 Advantix and Advantage products are 100% effective;

E.     The Court order Bayer to disseminate, in a form to be approved by the Court, corrective advertising sufficient to reach all those who were the target of its false and deceptive claims;

F.     The Court order Bayer, pursuant to 15 U.S.C. § 1116(a), to file with the Court and serve on Merial within thirty days after entry of the injunction a report in writing and under oath setting forth in detail the manner and form in which Bayer has complied with the injunction;

G.     The Court award Merial Bayer's profits and/or Merial's damages from Bayer's false and misleading advertising, deceptive trade practices, and unfair competition, in an amount to be determined by the trier of fact and to be increased as provided by applicable law due to Bayer's willful violation of the law;

H.     The Court declare that this is an "exceptional case" under 15 U.S.C. § 1117(a), and that Merial is therefore entitled to an award of its attorneys' fees and full costs;

I.     The Court award Merial its costs in connection with this action;

-40-

J.     The Court award Merial punitive damages for Bayer's intentional, willful, and malicious conduct to the extent permitted by law; and

K.     The Court award Merial such other and further relief as the Court deems just and proper.

This 26th day of June, 2012.

                              Respectfully submitted,

                              McKOOL SMITH, P.C.

                              /s/ Jill Wasserman
                              Courtland L. Reichman
                                (Ga. Bar No. 599894)
                              Jill Wasserman
                                (Ga. Bar No. 739662)
                              1201 Peachtree, Suite 200
                              400 Colony Square
                              Atlanta, GA 30361
                              (404) 572-4600

                              Steven Callahan
                                (Admitted *Pro Hac Vice*)
                              300 Crescent Court, Suite 1500
                              Dallas, TX 75201
                              (214) 978-6357

                              *Attorneys for Plaintiff MERIAL LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH LR 5.1(C)</u>

This is to certify that the foregoing document was prepared using Times New Roman 14 point font in accordance with LR 5.1(C).

DATED:  June 26, 2012

<u>/s/ Jill Wasserman</u>
Jill Wasserman

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically pursuant to LR 5.1 on June 26, 2012 using the Court's CM/ECF system, which will automatically send e-mail notification of the filing to the parties' attorneys of record.

<u>/s/ Jill Wasserman</u>
Jill Wasserman

-42-