# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| MERIAL LLC, | ) | |
| | ) | CIVIL ACTION FILE |
| Plaintiff and Counterclaim-Defendant, | ) | NO. 1:11-cv-02888-JOF |
| | ) | |
| v. | ) | |
| | ) | |
| BAYER HEALTHCARE LLC | ) | |
| | ) | |
| Defendant and Counterclaim-Plaintiff. | ) | |

## BAYER HEALTHCARE LLC'S AMENDED COUNTERCLAIMS AGAINST MERIAL LLC AND ANSWER TO FIRST AMENDED COMPLAINT

## AMENDED COUNTERCLAIMS

Bayer HealthCare LLC ("Bayer"), by and through its attorneys Debevoise & Plimpton LLP and Womble Carlyle Sandridge & Rice PLLC, for its counterclaims against counterclaim-defendant Merial LLC ("Merial"), respectfully alleges as follows:

### Nature of the Action

1.     This is an action for false advertising and unfair competition under federal and state law against Merial LLC ("Merial"), which competes directly against Bayer's Animal Health Division in the sale of pet medicines.  Merial is

conducting a coordinated national advertising campaign (including print, television and Internet advertising) which attempts to maintain the dominance of its market leading flea and tick product Frontline Plus with multiple false and misleading claims centered around the description of its product as the "complete killing force" that "annihilates" fleas and ticks. Those false and misleading claims include that Frontline Plus kills fleas and ticks immediately following application, that it is 100 percent effective against fleas and ticks, and that it retains that complete effectiveness for a full 30 days.

2.     Bayer, which manufactures the competing products K9 Advantix[®] II and Advantage[®] II, initially raised its concerns in a challenge before the National Advertising Division of the Advertising Self-Regulatory Council (the "NAD"), the advertising industry's respected self-regulatory forum for resolution of advertising disputes. Merial voluntarily participated in the NAD proceeding. After the NAD's decision recommended that Merial discontinue false and misleading aspects of its advertising campaign, including the implied claims that Frontline Plus was 100 percent effective and that it killed fleas and ticks immediately following application, Merial said that it would take most of those recommendations into account in its future advertising. However, Merial

appealed the NAD's decision regarding the implied claim of immediate efficacy to the National Advertising Review Board (the "NARB"), the advertising industry's respected self-regulatory forum for appeals of NAD decisions.  When the four-person NARB panel unanimously affirmed the NAD's decision, Merial promised to take the NAD's and NARB's recommendations into account in its future advertising.

3.     Despite Merial's promises to comply with the NAD and NARB decisions, Merial continued to disseminate the very same false and misleading advertising claims it was asked by both bodies to discontinue.  Merial even refused to change its misleading campaign when (at Bayer's request) the NAD undertook a compliance inquiry and found that Merial had failed to comply with its and the NARB's decisions.  The NAD thereafter took the rare step of referring Merial's false advertising to the Federal Trade Commission (the "FTC") for enforcement.   Merial thereafter filed this declaratory judgment claim in an effort to preempt FTC action and deflect attention from its own wrongdoing—a goal that has already been partially met:  The FTC issued a letter indicating it would take no further action at this time in light of the pending litigation.

4.     In the meantime, during the pendency of this litigation, Merial has continued its practice of deceptive advertising.   In its latest advertising campaign, Merial further reinforces the false and misleading message that Frontline Plus is 100 percent effective by continuing to claim, among other things, that it "annihilates," "eliminates" and "wipes out" fleas.

5.     Merial's false and misleading advertising has deceived consumers into believing that Frontline Plus is a "complete killing force" that immediately kills and annihilates all fleas and ticks and continues to do so all month long, and as such, that Frontline Plus is superior to Bayer's competing products. These claims are demonstrably false.  Frontline Plus takes many hours to kill all fleas on a pet, days to kill all ticks, and does not maintain 100% efficacy for a full 30 days; to the contrary, Merial's own studies show that its efficacy against fleas drops to below 87% during the month after treatment, and its efficacy against ticks drops to as low as 81.1%.   Because Merial has refused to discontinue its false claims (notwithstanding the findings of the NAD and NARB), these false claims will continue to deceive consumers unless stopped by the Court.  On information and belief, Merial's conduct has already resulted

in lost sales for Bayer and, if not enjoined, will continue to cause harm to Bayer.

6.      In an attempt to give this case a focus other than its own misconduct, Merial has included with its declaratory judgment claim a wholly unrelated set of claims related to Bayer's advertising for an unrelated product, Advantage Multi®.  That advertising reports the results of a peer-reviewed study led by Dr. Byron L. Blagburn of Auburn University that demonstrates the superiority of Bayer's Advantage Multi® to other leading brands, including Merial's Heartgard Plus, in killing a challenging strain of heartworm called MP3.

7.      Heartworms can be fatal to dogs.   Because even a single heartworm can lead to fatality, the Food and Drug Administration's Center for Veterinary Medicine (the "FDA"), which approves heartworm preventatives, requires that a heartworm preventative be proven 100% effective in order to obtain FDA approval for the product.

8.      The MP3 heartworm strain was isolated in 2006 from a naturally infected dog in Georgia.  Research has shown that the MP3 strain has greater resistance than other strains to most heartworm preventatives.  To study the

efficacy of different preventatives against this challenging strain, Dr. Blagburn tested the effectiveness of four different heartworm preventatives in dogs infected with the MP3 strain.  In the groups treated with brands other than Advantage Multi® – including the group treated with Merial's Heartgard Plus – only one dog out of eight was free of heartworms, which meant that the product prevented heartworm disease from the MP3 strain in *only 12.5 percent* of dogs tested.  In the group treated with Advantage Multi®, *none* of the dogs had any heartworms, which means that Advantage Multi® prevented heartworm disease from the MP3 strain in *100 percent* of the dogs tested.

9.      This study is potentially important to veterinarians and pet owners. Over the last decade, the FDA has received reports of dogs becoming infected with heartworms despite receiving preventative treatment.  Some of this loss of efficacy may result from a failure of some pet owners to comply with treatment instructions.  But the FDA and other researchers have also found evidence that some heartworm strains have developed resistance to some leading heartworm preventatives.

10.      Given veterinarians' and pet owners' concerns about drug-resistant strains of heartworms, Bayer has both the right and the obligation to make this

information available to veterinarians. In fact, every branded advertisement identified by Merial in its First Amended Complaint is directed at a sophisticated audience of veterinarians. The only ad directed to consumers is a single televised public service announcement which does not mention any Bayer or Merial product and instructs pet owners to talk to their veterinarian about heartworm prevention. Merial should not be allowed to use legal action to prevent Bayer from communicating this important information to veterinarians or from encouraging pet owners to communicate with their pets' veterinarians.

## The Parties

11.     Bayer HealthCare LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 555 White Plains Road, Tarrytown, New York 10591. Bayer owns rights in the United States to a number of pet medicine brands, including the flea preventative Advantage® II, the flea and tick preventative K9 Advantix® II, and the heartworm and flea preventative Advantage Multi®. Bayer distributes these brands in Georgia and throughout the United States.

12.     Upon information and belief, Merial is a company limited by shares registered in England and Wales with a registered office at PO Box 327,

Sandringham House, Harlow Business Park, Harlow, Essex CM19 5QA, England. It is domesticated in Delaware as Merial LLC, and has a place of business at 3239 Satellite Blvd., Duluth, Georgia 30096. Merial is a supplier of pet medicines, including Frontline Plus and Heartgard Plus.

## Jurisdiction and Venue

13.     This Court has original jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332 and 1338 and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The amount in controversy is in excess of $75,000 exclusive of interest and costs.

14.     This Court has personal jurisdiction over Merial pursuant to 28 U.S.C. § 1391. Upon information and belief, Merial has a place of business in the State of Georgia and in this District, has transacted and done business in the State of Georgia and in this District, and has disseminated its false advertising in the State of Georgia and in this District.

15.     On information and belief, venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because Merial is deemed to reside in this District. Venue also is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District, including the distribution of Merial's false advertising in this District.

### Merial's 2010-2011 False and Misleading Advertising

16.   Merial began its deceptive advertising campaign in the spring of 2010 ("Merial's 2010-2011 Advertising").  The main theme of Merial's 2010-2011 Advertising was that Frontline Plus is a "complete killer" and a "complete killing force," falsely implying that Frontline Plus is 100% effective at "annihilating fleas and ticks."

17.   This theme has run across multiple media.  Throughout 2010 and 2011, Merial's television commercials trumpeted:  "Using Frontline shows your pet you care by unleashing a complete killing force against fleas and ticks."  *See* Exhibit A.  Print ads also encouraged consumers to "[u]nleash the complete killing force against fleas and ticks."  *See* Exhibit B.  The Frontline Plus website, which was still up and running as of June 4, 2012, was actually called www.completekiller.com, and contained similar misleading language.  *See* Exhibit C.

18.   The use of the word "complete" to modify "killer" and "killing force" in Merial's 2010-2011 Advertising necessarily implied that Frontline Plus has 100 percent efficacy – that it keeps dogs and cats completely free of fleas and ticks for an entire month.  (Merial's and Bayer's products are indicated for dosing once a month.)  This necessary implication was reinforced

9

by the other language used in Merial's 2010-2011 Advertising.  For example, some Merial television commercials characterized Frontline Plus as "annihilating fleas and ticks."  *See* Exhibit D; *see also* Exhibits B, E.  Another commercial claimed that Frontline Plus "[k]ills 100% of fleas within 12 hrs" and that "it keeps killing fleas and ticks all month long."  Exhibit A (July 5, 2011 commercial).

19.    Merial's initial advertisements in this campaign also made false express claims of Frontline Plus's superiority to competing products.  For example, a television commercial stated:  "Unlike other products from your vet, Frontline Plus also kills flea[] eggs and larva[e], and keeps killing for 30 days on dogs and cats."  Exhibit A (May 21, 2010 commercial).  Similarly, a print advertisement which appeared in numerous national magazines stated:  "Unlike other products from your vet, only FRONTLINE® Plus completely annihilates the flea life cycle on dogs and cats by killing fleas as adults, eggs, and larvae."  Exhibit B (print advertisements with 2010 copyright notice).  These assertions were literally false at the time the advertisements first ran because other products, such as Summit's Vectra products (which also are available through veterinarians), also kill flea eggs, larvae and adult fleas for 30 days on dogs and

cats.  (Bayer's Advantage® II also kills flea eggs, larvae and adult fleas on dogs and is available through veterinarians, although it had not yet been introduced when Merial began its deceptive advertising campaign.)

20.    Consumers were also likely to take away a general implied superiority message from Merial's initial ads – in particular Merial's claims that, "unlike other products from your vet," Frontline Plus provides "complete protection" or a "complete killing force."  This implied claim is false for several reasons:  First, Frontline Plus does not kill or repel mosquitoes or repel biting flies, benefits that Bayer's K9 Advantix® II does offer (as did its predecessor, K9 Advantix®).  Second, the results of head-to-head testing suggest that, if anything, Frontline Plus performs worse than Bayer's K9 Advantix® II (and its predecessor, K9 Advantix®) in terms of speed of kill and efficacy.

21.    Merial's advertising is having the impact Merial desires:  A survey conducted by Dr. Gerald Ford found that, net of a control cell, over 38 percent of potential consumers who viewed Merial's 2010-2011 print advertisement believed that Frontline Plus kills 100 percent of fleas and ticks on pets as a result of Merial's misleading advertisement.  The NAD found the survey as a

whole to be persuasive and credible evidence that Merial's advertising was likely to deceive consumers.

22.     The claim that Frontline Plus kills 100 percent of fleas and ticks is false.  In fact, a 2007 study showed that Frontline Plus killed only 91.7 percent of fleas 24 days after treatment and only 86.9 percent of fleas 28 days after treatment.   Another 2007 study showed that Frontline Plus killed only 86.3 percent of ticks on dogs 14 days after applications, and only 81.1 percent of ticks on dogs 28 days after application.

23.     Merial's 2010-2011 Advertising also featured a recurring, deceptive "ninja" theme that falsely implied that Frontline Plus kills immediately upon application.  For example, several of Merial's commercials showed drops of Frontline Plus being applied to a dog and then turning into animated green ninjas that, upon landing on the dog, immediately began to kill all the fleas and ticks.  *See* Exhibit A.  Those commercials showed the ninjas finishing the job in well under 30 seconds from application.  As both the NAD and NARB found, consumers were likely to understand from these visual depictions that Frontline Plus kills all fleas and ticks on a pet immediately upon application.  This implied claim of immediate efficacy is false.  In fact, it takes

hours for Frontline Plus to disperse over a pet's skin and hair.  One study showed that Frontline Plus had only 46.5 percent efficacy against fleas on dogs in the first eight hours after treatment; another showed that, 24 hours after application, Frontline Plus had killed only 10.7 percent of ticks.  Even after Frontline Plus reaches peak efficacy, its efficacy begins to fade; as noted above, Frontline Plus does not maintain peak efficacy for an entire month.

## Merial's Noncompliance with NAD and NARB Decisions

24.    On June 15, 2010, Bayer sent a letter to the NAD challenging Merial's false and misleading advertising.  The NAD is the premier self-regulatory arbiter of advertising disputes in the United States.  Through its advertisement review process, it aims to provide the most effective, efficient, fairest and least expensive forum in the United States for settling advertising disputes.  Courts have frequently acknowledged the NAD's unique expertise in advertising disputes and the high rate of advertiser compliance with its decisions.  The NAD process is entirely voluntary, and Merial willingly participated.

25.    The NAD issued its decision on November 3, 2010.  Based in part on Bayer's compelling survey evidence, the NAD concluded that consumers "would be reasonable to understand the phrase 'complete killing force' as

meaning that the product works 'completely'" and is 100 percent effective. Exhibit H.  The NAD concluded that the "complete killing" claims were misleading, and recommended that they be discontinued.  *Id.*  Merial promised to "take NAD's concern into account."

26.   The NAD also concluded that Merial's television commercials improperly "convey[ed] the message that the product reaches full efficacy immediately upon application."  *Id.* The NAD recommended that Merial's advertising be discontinued or modified so that it no longer implied this false claim.  Merial appealed this part of the NAD's decision to the NARB, but the NARB unanimously affirmed the NAD's decision.  The NARB concluded that "the commercial reasonably suggests widespread disbursement and killing of fleas and ticks immediately after application of Frontline® Plus."  Exhibit I. Although Merial stated that it disagreed with the panel's decision, it nevertheless noted that it "respects the self regulatory process of the National Advertising Review Board and will give due consideration to the Panel's recommendation in connection with future advertising for Frontline Plus."  *Id.*, p. 4.

27.     Although Merial had promised in November 2010 to "take NAD's concern into account" with respect to the "complete killing" claims, Exhibit H, p. 13, and although NAD practice requires an advertiser to implement agreed changes promptly, Merial did not do so.  Instead of immediately discontinuing its misleading "complete killing" claims, Merial waited until March 2011 to modify its television commercial.  That new ad, though, continued to use the discredited "complete killing force" language.  Exhibit A (March 28, 2011 commercial).  Even after it was informed in early May 2011 that the NARB would affirm the NAD's decision, Merial continued to air versions of its false and misleading television commercial, spending more than $3 million on advertising slots for what was essentially the same commercial between May 4 and June 7.  When Merial finally launched new revised ads in late May and early July, its new commercials were similarly misleading, including references to "unleashing a complete killing force," and images of the animated ninjas immediately killing all the fleas and ticks in their path and then assuming a "mission accomplished" stance.  *See* Exhibit A (May 26, 2011 and July 5, 2011 commercials).  Merial also introduced several new, shorter commercials in May 2011 featuring variations on the ninja animation, and directing consumers to the

"completekiller.com" website.  *See* Exhibit D.  All of these commercials continued to convey the false claims that Frontline Plus kills 100 percent of fleas and ticks for 30 days and that it begins immediately to kill fleas and ticks.

28.   In what can only be described as a pretextual effort to pretend to comply with NAD's decision, Merial added some disclaimers to its revised versions of the television commercial, but they were patently insufficient to mitigate the highly misleading "complete killing force" language.  For example, a new voiceover in the revised commercials stated, "What makes Frontline Plus complete is that it breaks the flea life cycle, killing adults, eggs, and larva[e]," and a supertitle later flashed on screen that stated, "Kills 100% of fleas within 12 hrs."  These disclaimers were completely ineffective; consumers were still likely to be confused into believing that Frontline Plus kills 100 percent of fleas and ticks for an entire month, particularly because the voiceover also stated that Frontline Plus "keeps killing fleas and ticks all month long."

29.   Merial also continued to use the false and misleading "complete killing force" language in print advertisements and on its website, including in the website's very domain name, www.completekiller.com—a domain name that was still active as of June 4, 2012.  That advertising also included

purported disclaimers such as:  "What makes FRONTLINE® Plus complete?  It annihilates the flea life cycle by killing fleas as adults, eggs, and larvae.  Ticks, too."  Even if a consumer noticed this language, it would have likely reinforced the advertisement's false message that Frontline Plus "annihilates" 100 percent of fleas and ticks.  That message was also reinforced by Merial's banner advertising on other websites, which read: "Annihilate fleas and ticks everywhere your pet goes."  *See* Exhibit E.

30.    Despite the conclusions reached by both the NAD and the NARB that Merial's animation sequence falsely implied that Frontline Plus takes effect immediately, Merial also retained its ninja animation in its entirety in the revised commercials.  All Merial did was to add a brief supertitle to the commercial stating "Starts killing fleas within 4 hrs," but, like Merial's other disclaimers, that supertitle did not override the overwhelming message of immediate efficacy that was communicated by the entirety of the ad.

31.    On June 6, 2011, Bayer requested that the NAD open a compliance inquiry.  In a decision issued on June 28, 2011, the NAD found that Merial had failed to comply with its recommendations:    "Contrary to NAD's recommendation, the flea and tick killing spree still commences immediately

upon application of the product. . . .   NAD was [also] troubled by Merial's continued usage of the claim 'complete killing force'—a claim that NAD recommended be 'discontinued' altogether—not merely modified."   The NAD also held that the "Starts killing within 4 hrs" supertitle is "not sufficiently clear and conspicuous" and "do[es] not correct the overriding message of immediate efficacy that is conveyed by the animation."   Exhibit J.

32.     Despite Merial's voluntary participation in the NAD and NARB proceedings and its agreement at every step of those proceedings to accept and comply with the decisions, Merial refused to bring its advertising into compliance with those bodies' determinations.   As a result, the NAD referred Merial to the FTC, which opened its own review.   *Id.*

33.     Anticipating action by the FTC, Merial attempted to preempt enforcement by the FTC by launching this declaratory judgment action. Merial's attempt was successful; the FTC issued a letter on November 17, 2011 indicating it would take no additional action at that time based in part upon the pendency of this litigation.   Exhibit K.

## Merial's 2012 False and Misleading Advertising

34.     Merial recently embarked on a new advertising campaign ("Merial's 2012 Advertising") that makes the same false and misleading claims.

35.    In this new campaign, Merial continues to advertise that its products "annihilate" fleas.  Although Merial has discontinued use of the word "complete," it has merely replaced that word with equally misleading terms such as "wipes out" or "eliminates" so that it can communicate the same deceptive message to consumers.  For example, new print advertisements, some of which continue to feature the same green ninja characters, claim that Frontline Plus "annihilates the flea life cycle" and "wipes out" fleas by "eliminating" eggs and larvae.  Exhibits F & G.  A new commercial featuring the same animated ninjas as prior commercials similarly boasts that Frontline Plus "eliminates" flea eggs and larvae, "annihilating" the entire next generation.

36.    Merial's changes are merely cosmetic and its new advertisements are just as misleading as its prior advertising.  Consumers who view Merial's new advertising are just as likely to be misled.  That Merial would make such insignificant revisions and pretend that it solves the problems of its prior ads serves only to highlight the contempt and disdain it has for the NAD and NARB decisions and for its obligation to promulgate only truthful, substantiated advertising claims.

37.     Merial also continued (at least until June 4, 2012) to use the domain name www.completekiller.com, which implied to consumers that Frontline Plus will completely eliminate fleas.  Users who entered this domain name into their browser or clicked on advertisements or listings for the www.completekiller.com domain name, however, were automatically redirected to a new web page located at www.frontlinekillers.com, which prominently displayed Merial's new deceptive commercial featuring ninjas. This change did nothing to reduce the misleading nature of the www.completekiller.com domain name, let alone the false messages communicated by the contents of Merial's website.

38.     On information and belief, Merial's deceptive advertising campaign has already caused injury to Bayer, including the loss of sales.

## COUNT I:  FALSE ADVERTISING
## UNDER SECTION 43(a) OF THE LANHAM ACT

39.     Bayer repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

40.     The false, misleading and deceptive statements set forth above are material and will tend to deceive consumers.

41.     Merial, in connection with goods and services distributed in interstate commerce, has made and is continuing to make false, deceptive and misleading descriptions and representations of fact in commercial advertising and promotion, which misrepresent the nature, characteristics and qualities of Merial's goods, services and commercial activities, in violation of 15 U.S.C. § 1125(a).

42.     These violations have injured and will continue to injure Bayer and the public, causing deception, confusion and damage in an amount that cannot presently be ascertained.

43.     Merial's acts of false advertising and unfair competition have caused irreparable injury to Bayer and, unless restrained, will cause further irreparable injury, leaving Bayer with no adequate remedy at law.

44.     By reason of the foregoing, Bayer is entitled to permanent injunctive relief against Merial restraining further acts of false advertising and unfair competition and requiring Merial to correct its false and misleading statements, and to recover damages caused by reason of Merial's aforesaid acts in an amount to be determined at trial.

## COUNT II:  VIOLATION OF THE GEORGIA DECEPTIVE TRADE PRACTICES ACT

45.     Bayer repeats and realleges each and every allegation in paragraphs 1 through 44 as if fully set forth herein.

46.     Merial has made and is continuing to make false, deceptive and misleading descriptions and representations of fact in commercial advertising and promotion, which misrepresent the nature, characteristics and qualities of Merial's goods, services and commercial activities.

47.     Merial's false, deceptive and misleading advertising and promotional activities violate the Georgia Deceptive Trade Practices Act, O.C.G.A. § 10-1-372, and the analogous unfair and deceptive acts and practices acts of the other states in which Merial is running its false advertising.  *See*, *e.g.*, Kan. Stat. Ann. § 50-626.

## COUNT III:  FALSE ADVERTISING UNDER STATE LAW

48.     Bayer repeats and realleges each and every allegation in paragraphs 1 through 47 as if fully set forth herein.

49.     Merial has made and is continuing to make false, deceptive and misleading descriptions and representations of fact in commercial advertising

and promotion, which misrepresent the nature, characteristics and qualities of Merial's goods, services and commercial activities.

50.    Merial's advertising has had an impact on consumers and is deceptive or misleading in a material way.

51.    Bayer has suffered injury as a result of Merial's advertising.

52.    Merial's acts as described above constitute false advertising violations under O.C.G.A. §§ 10-1-421 and 10-1-423 and under analogous laws in other states in which Merial's products and services are sold.  *See*, *e.g.*, Kan. Stat. Ann. § 65-672; N.Y. Gen. Bus. Law § 350 (McKinney 2011).

## COUNT IV:  UNFAIR COMPETITION UNDER STATE COMMON LAW

53.    Bayer repeats and realleges each and every allegation in paragraphs 1 through 52 as if fully set forth herein.

54.    Merial has made and is continuing to make false, deceptive and misleading descriptions and representations of fact in commercial advertising and promotion, which misrepresent the nature, characteristics and qualities of Merial's goods, services and commercial activities.

55.     These violations have injured and will continue to injure Bayer and the public, causing deception, confusion and damage in an amount that cannot presently be ascertained.

56.     Merial's acts of false advertising and unfair competition have caused irreparable injury to Bayer and, unless restrained, will cause further irreparable injury, leaving Bayer with no adequate remedy at law.

57.     The acts of Merial as described above constitute unfair competition in violation of Bayer's rights under Georgia State common law and under analogous unfair competition law in other states in which Merial has disseminated its false and misleading advertising.

## ANSWER TO FIRST AMENDED COMPLAINT

Bayer hereby answers the correspondingly numbered paragraphs of Merial's First Amended Complaint as set forth below.  Unless expressly admitted, all allegations in the First Amended Complaint are hereby denied.

## NATURE OF ACTION

1.     Bayer admits that Merial brings this action to address certain alleged false advertising as set forth in paragraph 1 of the First Amended Complaint, but denies the validity of said allegations and otherwise denies the allegations in this paragraph.

2.      Denied.

3.      Bayer admits that it has asserted that Merial's advertising for Frontline Plus is false and misleading, except refers to Bayer's Amended Counterclaims above for a full and accurate description of Bayer's allegations. Bayer further admits that Merial asserts that certain of Bayer's advertising for K9 Advantix and Advantage products allegedly constitute false advertising, but denies the validity of said allegations and otherwise denies the allegations in this paragraph.

4.      Bayer admits that Merial pleads various claims under federal trademark law and related claims under Georgia law and seeks the relief requested, but denies the validity of said claims and relief.

5.      Bayer denies the allegations in this paragraph, except admits that Merial brings a declaratory judgment action seeking a judgment that it has not violated the Lanham Act.

6.      Bayer denies the allegations in this paragraph, except admits that Merial brings a declaratory judgment action.

7.      Bayer admits that Merial brings an action for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Section

43(a) of the Lanham Act, 15 U.S.C. § 1125(a), seeking a declaratory judgment that its print, television, and Internet advertisements for Frontline Plus do not violate the Lanham Act, but denies the validity of the allegations and relief sought.

PARTIES

8.    Admitted.

9.    Bayer admits the allegations in the first sentence of this paragraph. Bayer denies the allegations in the second sentence of this paragraph, and states that Bayer manufactures and distributes prescription and over-the-counter animal health care products throughout the United States through its Animal Health Division, the principal office of which is Shawnee, Kansas.  Bayer admits the allegations in the third sentence of this paragraph, and states that it competes with Merial by selling veterinary pharmaceutical products throughout the United States, including Advantage Multi®, K9 Advantix® II and Advantage® II; Bayer no longer sells K9 Advantix® or Advantage® in the United States.[1]

---

[1]    Given the allegation in paragraph 3 of the First Amended Complaint, defining K9 Advantix and Advantage as products utilizing the K9 Advantix and Advantage trademarks, for the purposes of this Answer, Bayer is interpreting references elsewhere in the First Amended Complaint to K9

<u>JURISDICTION AND VENUE</u>

10.      This paragraph contains legal conclusions to which no response is required.

11.      The first sentence of this paragraph contains legal conclusions to which no response is required.  Bayer denies the allegations in the second and third sentences of this paragraph, and states that it sells Advantage Multi®, K9 Advantix® II and Advantage® II.

<u>FACTS</u>

**I.      HEARTWORM DISEASE**

12.      Admitted.

13.      Admitted.

14.      Bayer admits the allegations in the first, second and fourth sentences of this paragraph, and denies the allegations in the third sentence of this paragraph.

**II.      THE PARTIES' HEARTWORM PREVENTIVES**

15.      Admitted.

---

Advantix and Advantage as referring to K9 Advantix II and Advantage II. For purposes of clarity, as noted above, Bayer no longer sells K9 Advantix and Advantage in the United States and nothing in this Answer should be construed as an admission to the contrary.

A.   Merial's HEARTGARD Product

16.   Bayer admits that HEARTGARD Plus is a beef chew formulation containing ivermectin (a macrocyclic lactone) to prevent heartworm disease and pyrantel pamoate to treat certain intestinal parasitic infections, denies the allegations in the fourth sentence of this paragraph, and otherwise denies knowledge or information sufficient to form a belief as to the remaining allegations in this paragraph.

17.   Bayer admits the allegations in this paragraph, except refers to the source quoted in this paragraph for a full and accurate description of its contents.

B.   Bayer's Advantage Multi Product

18.   Admitted.

19.   Bayer admits the allegations in this paragraph, except refers to the source quoted in this paragraph for a full and accurate description of its contents.

20.   Admitted.

21.   Denied.

### III.    THE BLAGBURN REPORT

22.    Bayer admits that Bayer engaged Dr. Byron Blagburn (a researcher who occasionally consults for Bayer and for other animal health companies) to conduct a study and that Merial attaches as Exhibit C to the First Amended Complaint a copy of the report of that study entitled "Comparative efficacy of four commercially available heartworm preventative products against the MP3 laboratory strain of *Dirofilaria immitis*" (the "Blagburn Report"), refers to the Blagburn Report for a full and accurate description of its contents, and otherwise denies the remaining allegations in this paragraph.

23.    Bayer denies the allegations in this paragraph and refers to the Blagburn Report for a full and accurate description of its contents.

24.    Bayer admits the allegations in this paragraph, except refers to the Blagburn Report for a full and accurate description of its contents.

25.    Bayer admits the allegations in the first sentence of this paragraph, except refers to the Blagburn Report for a full and accurate description of its contents.  Bayer denies the allegations in the second sentence of this paragraph.

26.    Bayer denies the allegations in this paragraph, except admits that labels for each of the tested products call for monthly dosing and that only one

dose was given to each dog in Dr. Blagburn's heartworm study.  Bayer refers to the referenced documents for a full and complete description of their contents.

27.     Bayer denies the allegations in this paragraph, except admits that the language quoted comes from the Blagburn Report but not from the place cited and refers to the Blagburn Report for a full and complete description of its contents.

28.     Bayer denies the allegations in this paragraph and refers to the Blagburn Report for a full and complete description of its contents.

## IV.     BAYER'S PROMOTION OF THE BLAGBURN REPORT

29.     Bayer admits the allegations in the first sentence of this paragraph. Bayer admits that Merial attaches the various documents listed in the second sentence of this paragraph as exhibits to the First Amended Complaint and that those documents are included in Bayer's advertising campaign to promote Advantage Multi®.  Bayer refers to said documents for a full and complete description of their contents and otherwise denies the allegations in the second sentence of this paragraph.  Bayer denies the allegations in the third sentence of this paragraph.

      A.    <u>Bayer's Press Release</u>

30.    Bayer denies the allegations in the first sentence of this paragraph and refers to the document referenced (the "Bayer Press Release") for a full and complete description of its contents.  Bayer admits the allegations in the second sentence of this paragraph.

31.    Bayer admits the allegations in this paragraph, except refers to the Bayer Press Release for a full and complete description of its contents.

32.    Bayer denies the allegations in this paragraph.

33.    Bayer admits the allegations in the first sentence of this paragraph, except refers to the Bayer Press Release for a full and complete description of its contents.  Bayer denies the allegations in the remaining sentences of this paragraph.

      B.    <u>Bayer's 4-Page NAVC Brochure</u>

34.    Admitted.

35.    Admitted.

36.    Denied.

37.    Bayer admits the allegations in the first sentence of this paragraph, except refers to the document referenced (the "NAVC Brochure") for a full and

complete description of its contents.  Bayer denies the allegations in the second sentence of this paragraph.

38.    Bayer denies the allegations in this paragraph and refers to the documents referenced for a full and complete description of their contents.

39.    Bayer admits the allegations in this paragraph, except refers to the NAVC Brochure for a full and complete description of its contents.

40.    Bayer admits the allegations in this paragraph, except refers to the NAVC Brochure for a full and complete description of its contents.

41.    Bayer denies the allegations in the first and third sentences of this paragraph.  Bayer admits the allegations in the second sentence of this paragraph, and refers to the referenced labels for a full and complete description of their contents.

C.    The Dear Vet Fax

42.    Bayer denies the allegations in the first sentence of this paragraph, and states that Bayer distributed the fax reproduced as the first three pages of Exhibit F of Merial's First Amended Complaint on January 18, 2011 and refers to that fax for a full and complete description of its contents.  Bayer denies the allegations in the remaining sentences of this paragraph.

      D.    <u>Bayer's Beaker Ad</u>

43.    Bayer denies the allegations in this paragraph, except admits that the allegations accurately describe some aspects of the referenced advertisement and refers to the referenced advertisement for a full and complete description of its contents.

44.    Denied.

      E.    <u>The "Box" Mailer</u>

45.    Admitted.

46.    Denied, except admits that the Box Mailer is a three-dimensional box that includes insert cards that summarize the Blagburn Report.

47.    Denied.

      F.    <u>Bayer's Lethargic Dog Television Commercial</u>

48.    Bayer denies the allegations in the first sentence of this paragraph, states that Bayer's public service announcement aired for the first time in late February 2011, and refers to the advertisement for a full and complete description of its contents.  Bayer admits the allegations in the second sentence of this paragraph.

49.    Denied.

G.   Sales Representatives' Statements

50.   Denied.

51.   Denied.

H.   Deception

52.   Denied.

I.   Materiality

53.   Bayer denies knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

J.   Harm

54.   Denied.

K.   Summary of Bayer's Promotion of the Blagburn Report

55.   Denied.

**V.   THE PARTIES' TOPICAL PESTICIDES**

56.   Admitted.

A.    Merial's FRONTLINE PLUS Product

57.    Bayer denies knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, except admits that Merial's Frontline products include Frontline Plus in spot-on application form.

58.    Bayer admits the allegations in the first two sentences of this paragraph, except denies that Frontline Plus kills ticks at multiple stages of their life cycles.  Bayer denies the allegations in the third sentence of this paragraph.

59.    Bayer admits the allegations in the first sentence of this paragraph. Bayer denies knowledge or information sufficient to form a belief as to the truth of the other allegations in this paragraph.

60.    Denied.

B.    Bayer's K9 Advantix and Advantage Products

61.    Admitted, and Bayer states that K9 Advantix II and Advantage II are also aimed at repelling pests (a benefit that Frontline Plus does not supply).

62.    Bayer denies the allegations in this paragraph, except admits that K9 Advantix® II contains imidacloprid and permethrin, that permethrin may be toxic to cats if it is ingested, and accordingly, K9 Advantix II should not be used on cats.

63.     Bayer denies the allegations in this paragraph, except admits that Advantage® II contains imidacloprid, which starts to kill fleas on contact, and that it can be used on both cats and dogs.

## VI.     MERIAL'S ADVERTISEMENTS FOR FRONTLINE PLUS

64.     Bayer denies the allegations in this paragraph, except admits that Merial's advertising campaign for Frontline Plus includes print, television and Internet advertisements.

### A.     Bayer's Prior Challenge

65.     Bayer denies the allegations in this paragraph, except admits that Bayer initiated a challenge with the NAD against certain of Merial's advertisements for Frontline Plus on June 14, 2010, that the NAD is a self-regulatory forum, and that Bayer alleged that certain Merial advertisements were false, misleading and unsubstantiated.

66.     Bayer denies the allegations in this paragraph, except admits that Merial responded and disputed Bayer's allegations in the NAD proceeding.

67.     Bayer denies the allegations in this paragraph, and states that the NAD heard from both parties and issued a decision in November 2010 and that the NAD determined that Merial had adequate support for just one of the

challenged claims in its advertisements, that Frontline Plus "kills up to 100% of fleas in 18 hours," while also finding that Merial lacked support for several of its claims and recommended that those unsupported, false and misleading advertising claims be modified or discontinued. *See* Exhibit H. Bayer refers to that decision for a full and accurate description of its contents.

68.     Bayer denies the allegations in this paragraph, except admits that the NAD recommended that Merial discontinue or modify certain claims in its advertisements (including that it discontinue all "complete killing"/"complete killing force" claims, that it modify its "unlike other products" claims, and that it discontinue or modify the ninja animation sequence in its television commercials), admits that Merial stated that it would take the NAD's recommendations into account in future advertising, and admits that Merial appealed to the NARB. Bayer refers to the NAD decision referred to in the paragraph, including Merial's Advertiser's Statement, Exhibit H, for a full and accurate description of its contents.

69.     Admitted.

70.     Denied.

B.     Merial's FRONTLINE PLUS Advertising

71.     Bayer denies the allegations in this paragraph, except admits that Merial's advertising campaign for FRONTLINE PLUS includes print, television and Internet advertisements.

72.     Bayer admits that the quoted sentences are from one of the print advertisements at issue, except refers to the advertisement quoted in this paragraph for a full and accurate description of its contents.

73.     Denied.

74.     Bayer denies the allegations in this paragraph, except admits that the paragraph describes some aspects of the Merial commercial which aired on television and was available on Merial's website, refers to the commercial described in this paragraph for a full and accurate description of its contents, and specifically denies that the advertisement was accurate and substantiated.

75.     Bayer denies the allegations in the first, third and fourth sentences of this paragraph.  Bayer admits the allegations in the second sentence of this paragraph.

76.     Bayer admits the allegations in this paragraph, except refers to the commercial quoted in this paragraph for a full and accurate description of its contents.

77.    Denied.

78.    Bayer denies the allegations in this paragraph, except admits that Merial advertised for Frontline Plus on the completekiller.com website and that the website included the quoted phrases.  Bayer refers to that website for a full and accurate description of its contents.

79.    Bayer denies the allegations in this paragraph, and except admits that the paragraph describes some aspects of the website quoted in the paragraph and refers to the website for a full and accurate description of its contents.

80.    Denied.

C.    Bayer's Prior Compliance Inquiry to the NAD

81.    Bayer denies the allegations in this paragraph, except admits that Bayer requested on June 6, 2011 that the NAD initiate a compliance inquiry with respect to Merial's advertising for Frontline Plus and that Bayer alleged that Merial had failed to comply fully with the NAD's and NARB's recommendations.

82.    Bayer denies the allegations in this paragraph, except admits that Merial responded to the NAD's compliance inquiry.

83.     Admitted.

84.     Bayer denies the allegations in this paragraph, except denies knowledge or information sufficient to form a belief as to whether Merial genuinely disagrees with the NAD's compliance decision.

        D.     The Parties' Current Controversy

85.     Denied.

86.     Denied.

87.     Bayer admits the allegations in the first sentence of this paragraph. The second sentence of this paragraph contains legal conclusions to which no response is required.

88.     This paragraph contains legal conclusions to which no response is required, except the allegations in the second sentence, which Bayer denies.

**VII.   BAYER ACCUSES MERIAL OF FALSE ADVERTISING AND UNFAIR COMPETITION WITH RESPECT TO MERIAL'S FRONTLINE PLUS PRODUCT**

89.     Bayer denies the allegations in this paragraph, except admits that Bayer has asserted counterclaims against Merial and refers to Bayer's Amended Counterclaims above for a full and accurate description of Bayer's counterclaims.

90.     Bayer admits the allegations in this paragraph, except refers to
Bayer's Amended Counterclaims below for a full and accurate description of
Bayer's counterclaims.

### VIII.  BAYER MAKES EFFICACY CLAIMS SIMILAR TO MERIAL'S WITH RESPECT TO BAYER'S K9 ADVANTIX AND ADVANTAGE PRODUCTS

91.     Denied.

92.

A.      Bayer admits the allegations in the first and second
sentences of this paragraph, except refers to the advertisement for a full and
accurate description of its contents.  Bayer denies the allegations in the
remaining sentences of this paragraph and refers to the advertisement for a full
and accurate description of its contents.

B.      Bayer admits the allegations in the first and second
sentences of this paragraph, except refers to the advertisement for a full and
accurate description of its contents.  Bayer denies the allegations in the third
sentence of this paragraph and refers to the advertisement for a full and accurate
description of its contents.

C.     Bayer denies the allegations in this paragraph and refers to the referenced website for a full and accurate description of its contents.

93.     Denied.

## COUNT I

## FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT

94.     Bayer hereby incorporates by reference the responses in paragraphs 1 through 93 as though fully set forth herein.

95.     Denied.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

## COUNT II

## VIOLATION OF THE GEORGIA DECEPTIVE TRADE PRACTICE ACT

100.     Bayer hereby incorporates by reference the responses in paragraphs 1 through 99 as though fully set forth herein.

101.     Denied.

## COUNT III

## VIOLATION OF THE GEORGIA UNFAIR COMPETITION STATUTE

102.   Bayer hereby incorporates by reference the responses in paragraphs 1 through 101 as though fully set forth herein.

103.   Denied.

## COUNT IV

## COMMON LAW UNFAIR COMPETITION

104.   Bayer hereby incorporates by reference the responses in paragraphs 1 through 103 as though fully set forth herein.

105.   Denied.

## COUNT V

## DECLARATORY JUDGMENT

106.   Bayer hereby incorporates by reference the responses in paragraphs 1 through 105 as though fully set forth herein.

107.   This paragraph contains legal conclusions to which no response is required.

108.   Denied.

109.   Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The First Amended Complaint has failed to state a claim on which relief can be granted.

### Second Affirmative Defense

Merial's claims are barred, in whole or in part, under the doctrine of unclean hands.

### Third Affirmative Defense

Merial's claims are barred, in whole or in part, under the doctrines of waiver, estoppel and laches.

### Fourth Affirmative Defense

The statements challenged by Merial are protected by the First Amendment, and the injunction sought by Merial violates the First Amendment.

Bayer reserves its right to amend and/or supplement this Answer to the First Amended Complaint and plead additional affirmative defenses, the existence of which may become known through further investigation and/or discovery in connection with this action.

## JURY DEMAND

Bayer demands a trial by jury on all issues so triable as a matter of right and law.

## PRAYER FOR RELIEF

WHEREFORE, Bayer requests the Court as follows:

A.     That Merial and all those in active concert or participation with Merial (including but not limited to Merial's officers, directors, agents, servants, wholesalers, distributors, retailers, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns and contracting parties) be permanently enjoined from distributing, publishing, broadcasting or otherwise disseminating, in any manner or in any medium, the advertisements referenced in this pleading or shown in Exhibits A through G.

B.     That Merial and all those in active concert or participation with Merial (including but not limited to Merial's officers, directors, agents, servants, wholesalers, distributors, retailers, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns and contracting parties) be permanently enjoined from distributing, publishing, broadcasting or otherwise disseminating, in any manner or in any medium, any claims stating, suggesting or implying, directly or indirectly, that:

      1.    Frontline Plus kills all fleas throughout the course of a month following application;

      2.    Frontline Plus kills all ticks throughout the course of a month following application; or

      3.    Frontline Plus takes effect immediately upon application.

C.    That Merial and all those in active concert or participation with Merial (including but not limited to Merial's officers, directors, agents, servants, wholesalers, distributors, retailers, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns and contracting parties) be permanently enjoined from distributing, publishing, broadcasting or otherwise disseminating, in any manner or in any medium, any advertising using any phrases that suggest or imply, directly or indirectly, that Frontline Plus has 100 percent efficacy against fleas or ticks, including, but not limited to, the phrases "complete killing," "complete killer," "annihilate," "annihilating," "wipes out," "eliminates" and "eliminating."

D.    That Merial withdraw and recall from its sales representatives and any and all channels of distribution any letters, flyers, advertising, promotional material, office display materials, or any other matter distributed by it or on its behalf bearing any descriptions or representations constituting false advertising concerning Frontline Plus.

46

E.      That Merial and those in active concert or participation with Merial (including, but not limited to, Merial's officers, directors, agents, servants, wholesalers, distributors, retailers, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns and contracting parties) take affirmative steps to dispel such false impressions that heretofore have been created by the false advertising campaign described above, including, but not limited to, corrective advertising.

F.      That Merial account to Bayer for Merial's profits arising from the foregoing acts of false advertising and unfair competition.

G.      That, in accordance with such accounting, Bayer be awarded judgment for such profits and for three times Bayer's actual damages arising from Merial's unlawful conduct, pursuant to 15 U.S.C. § 1117, as a result of the willful and intentional violations of Merial.

H.      That the Court declare that this is an "exceptional case" under 15 U.S.C. § 1117(a), and that Bayer is therefore entitled to an award of its attorneys' fees and full costs.

I.      That Bayer be awarded its costs in connection with this action.

J.      That Bayer be awarded punitive damages for Merial's intentional, willful and malicious conduct to the extent permitted by law.

K.      That Merial file with the Court and serve on counsel for Bayer within thirty (30) days after entry of any injunction issued by the Court in this action, a sworn written statement pursuant to 15 U.S.C. § 1116(a) setting forth in detail the manner and form in which Merial has complied with any injunction which the Court may enter in this action.

L.      That Merial's First Amended Complaint be dismissed with prejudice, and the prayer for relief contained therein be denied in its entirety.

M.      That the Court grant such other and further relief as it may deem just and proper.

This 3rd day of July, 2012.

                                          Respectfully submitted,

                                          WOMBLE CARLYLE SANDRIDGE &
                                          RICE PLLC


                                          s/ Robert R. Ambler, Jr.
                                          Robert R. Ambler, Jr.
                                          (rambler@wcsr.com)
                                          Attorney Bar Number: 014462
                                          Russell A. Williams
                                          (rwilliams@wcsr.com)
                                          Attorney Bar Number: 141659

271 17th Street, NW, Suite 2400
Atlanta, GA 30363-1017
(404) 872-7000
(404) 879-2924 (fax)


DEBEVOISE & PLIMPTON LLP


s/ David H. Bernstein
David H. Bernstein
(dhbernstein@debevoise.com)
Michael Schaper
(mschaper@debevoise.com)
*Admitted Pro Hac Vice*

919 Third Avenue
New York, New York 10022
(212) 909-6696
(212) 521-7952 (fax)

*Attorneys for Defendant*
*Bayer HealthCare LLC*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| MERIAL LLC, | ) |
| | ) |
| Plaintiff and Counterclaim-Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| BAYER HEALTHCARE LLC | ) |
| | ) |
| Defendant and Counterclaim-Plaintiff. | ) |

_____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 3, 2012, I caused to be electronically filed Bayer HealthCare LLC's Amended Counterclaims Against Merial LLC And Answer To First Amended Complaint with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

> Courtland L. Reichman (creichman@McKoolSmith.com)
> Jill Wasserman (jwasserman@McKoolSmith.com)

<u>s/ David H. Bernstein</u>
Admitted Pro Hac Vice
Attorney for Bayer
HealthCare LLC

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Telephone: (212) 909-6696
Email: dhbernstein@debevoise.com

Robert R. Ambler, Jr.
Womble Carlyle Sandridge & Rice PLLC
271 17th Street, NW, Suite 2400
Atlanta, GA 30363-1017
Telephone: (404) 872-7000
Email: rambler@wcsr.com